FIRST NATIONAL BANK OF BARRON, Plaintiff-Respondent, v. BARRON COUNTY COOPERATIVE DAIRY CATTLE BREEDERS SALES ASSOCIATION and another, Defendants-Respondents: BARRON COUNTY HOLSTEIN BREEDERS ASSOCIATION, Defendant-Appellant.

*No. 75–76. Submitted on briefs January 6, 1977.— Decided March 29, 1977.*

(Also reported in 252 N. W. 2d 57.)

1

For the appellant the cause was submitted on the brief of *Gavic, Richardson & Skow* of Spring Valley.

For the respondent the cause was submitted on the brief of *Liden, Cusick and Dobberfuhl, S. C.,* of Barron.

DAY, J.   Defendant Barron County Holstein Breeders Association appeals from a judgment directing it to deliver two certificates of deposit to plaintiff First National Bank of Barron.   The certificates of deposit were issued in the name of the Holstein breeders association.   Under the judgment they are to be applied toward amounts owed the bank by defendant Barron County Cooperative Dairy Cattle Breeders Sales Association.

The evidence established that the sales association was formed 40 or 50 years earlier by the members of four breeder associations.   It was created as a co-operative marketing association.   The sales association charged a six percent commission on cattle sales.   Three and one-half percent went for expenses, two percent went for compensation of the sales association manager, and one-half of one percent went into a reserve fund, which was set up to protect against future losses.   It is not clear against what price the six percent commission was charged.   Apparently, the sales association bought the cattle outright and then re-sold the cattle for its own account.   In order to do this, it was necessary to borrow

money with which to pay for the cattle. According to the testimony of the former manager of the sales association, Emil Neuman, the loss contingency reserve was used as security for these loans. This was done pursuant to a standard form financing agreement which gave the bank a security interest in all "inventory, documents evidencing inventory, accounts, contract rights, instruments, chattel paper, general intangibles and personal property received as returns, trade-ins or repossessions, whether now owned or hereafter acquired, and all proceeds or products of any of them" owned by the sales association.

In 1969 or 1970, the loss contingency reserve, which had been held in passbook savings accounts, was converted into certificates of deposit. These certificates were issued in the names of the various breeding groups which did business with the sales association. The amounts were proportionate to the business done by each group. By September 1, 1972, there were only two breeder groups which participated in the loss contingency reserve. One was the Guernsey breeders association. Its interest was only about $250. The balance, over $10,-000 represented the interest of the Holstein breeders association.

On September 5, 1972, all indebtedness of the sales association to the bank was paid in full. This amounted to about $20,000. Shortly thereafter, the certificates of deposit in the name of the Holstein breeders association were delivered to an officer of that association. In December, 1972, the sales association borrowed $25,000 from the bank. It borrowed $4,215.41 more in January, 1973. It was unable to pay these notes when due, and the instant action resulted.

There was testimony that the loss contingency reserves were converted from passbook savings accounts to certificates of deposit in the names of various breeder

groups so that the interest on those accounts could be paid directly to the breeders, as a matter of convenience. Originally, any amounts over $15,000 in the loss contingency reserve were to be distributed. Subsequently, that limit was raised to $25,000.

The trial judge found that both the bank and the sales association regarded the bank's security agreement as constituting a security interest in the certificates of deposit; that the certificates of deposit had been issued in the name of the breeders association, but were in the possession of the sales association, ". . . until shortly before the Sales Association went out of business, at which time the certificates of deposit were taken from the office of the Sales Association and transferred to the possession of an officer of the Breeders Association." He also found that the Holstein breeders association dominated and controlled the sales association. He concluded that the bank was entitled to judgment against the Holstein breeders association for the two certificates of deposit, to be applied against the liability of the sales association. The issue on appeal is whether the findings support the conclusion. We hold they do not.

The bank argues that the funds underlying the certificates of deposit were derived from the sale of cattle belonging to individuals, and were not assets of the Holstein breeders association. Even if this is true, it is beside the point. The bank sued to enforce its security interest in the assets of the sales association. The question was whether the certificates belonged in fact to the sales association, not whether they belonged in fact to the Holstein breeders association. The bank's trial theory was that the certificates of deposit should be reformed to show the sales association as the owner of the deposits. However, the bank did not introduce the evidence necessary to reform the certificates. In order to estab-

lish that the sales association was the owner of the funds deposited, it was necessary for the bank to show that the sales association had articles or bylaws providing that net proceeds be credited to surplus or reserves under sec. 185.45 (4) (a), Stats. Without proof of these articles or bylaws, the provisions of sec. 185.45 (3) would govern. The proceeds from the co-operative business in excess of actual expenses and compensation of employees would belong to the patrons, not to the co-operative.

The complaint alleges that the sales association is a Wisconsin co-operative association. This is admitted by the answer. Sec. 185.45, Stats., governs the apportionment and distribution of proceeds of a Wisconsin co-operative. Under subsection (1) of the statute, expenses are deducted from the total proceeds. Under subsection (2) (b) a share may be paid to the officers or employes of the co-operative. This is what was done with five and one-half percent of the six percent "commission" charged by the sales association. Three and one-half percent was used to defray expenses. Two percent was paid to the manager of the sales association.

Sec. 185.45 (3), Stats., provides in part as follows:

"(3) Unless the articles or bylaws otherwise expressly provide, none of the remainder of the net proceeds shall constitute income of the co-operative but all thereof shall be distributed and paid to patrons, whether members or not, as follows:

"(a) Reasonable reserves for necessary purposes may be created, which shall be credited to patrons in accordance with the ratio which their patronage bears to total patronage.

"(b) All the remainder of the net proceeds shall be distributed and paid to patrons in accordance with the ratio which their patronage bears to total patronage."

Under this subsection, the one-half percent put into the loss contingency reserve was not income of the co-operative. Instead, it was considered a deposit by the

patrons which the co-operative could look to if the events contemplated in establishing the reserve should occur.

Sec. 185.45(4) provides in part as follows:

"(4) If the articles or bylaws so provide:
"(a) Any of the net proceeds may be credited to allocated or unallocated surplus or reserves of the cooperative.
"(b) None of the remainder shall constitute income to the co-operative, but all thereof shall be distributed and paid in accordance with the ration which individual patronage bears to total patronage . . . ."

If this subsection applied, the loss contingency reserve was an asset of the co-operative. It could be traced into the hands of the subsequent transferee if the property remaining in the hands of the co-operative was unreasonably small capital for the business in which it was engaged. Sec. 242.05, Stats., provides:

"Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent."

Sec. 185.45 was created by ch. 368 of the laws of 1955. A revision committee note states as follows:

"This section of apportionment and distribution of the proceeds has been completely rewritten from the former provision contained in 185.16 (1953). It provides two methods of distribution: (3) to be used by those associations which desire federal income tax exemptions; (4) may be used by other associations. In general, this section is set up in accordance with usual and customary accounting procedures . . . ." 22 Wis. Stats. Anno. 540, 541.

It was up to the bank to show that the sales association was organized as a subsection (4) co-operative, and that its articles or bylaws therefore allowed retention of a portion of the net proceeds. The bank did not make this showing. It introduced no evidence at all as to the articles or bylaws of the sales association. The funds underlying the loss contingency reserve were not proven to be the property of the sales association. Although held in a reserve, they belonged to the patrons. They were withdrawn at a time when there was no claim against the reserve. Therefore, the bank could not look to those funds for the satisfaction of a claim arising subsequent to the depletion of the reserve.

*By the Court.*—The judgment is reversed and cause remanded with directions to dismiss the complaint.